**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARILYN KAYE BOWEN,**

      **Plaintiff,**

**v.**                          **Case No.: 3:14-cv-26368**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10 & 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**;

and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On May 30, 2012, Plaintiff Marilyn Kaye Bowen ("Claimant"), filed an application for DIB, alleging a disability onset date of March 30, 2011, due to "back injury, arthritis, diabetes, depression, anxiety, hypertension, chronic fatigue, vitamin D deficiency, GERD, high cholesterol, [and] skeletal disorder." (Tr. at 163, 182). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 86, 97). Claimant filed a request for an administrative hearing, (Tr. at 104), which was held on December 2, 2013, before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 27-49). By written decision dated January 14, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-22). The ALJ's decision became the final decision of the Commissioner on August 8, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 58 years old at the time that she filed the instant application for benefits, and 60 years old on the date of the ALJ's decision. (Tr. at 22, 163). She has a high

school education, with an additional two years of vocational training in accounting and business, and she communicates in English. (Tr. at 32, 183). Claimant has previously worked as a shelf stocker, a cosmetic manager at a department store, a sales associate, and a bank teller. (Tr. at 33-36, 183).

### III.  <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination,

the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the

evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 30, 2011. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the severe impairments of "degenerative disc disease of the spine; osteoarthritis and obesity." (Tr. at 14-16, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of diabetes, high cholesterol, high blood pressure, fatigue, vitamin D deficiency, GERD, depression, and anxiety. (Tr. at 14-16). However, the ALJ found that these impairments were non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she can occasionally climb, balance, stoop, kneel, crouch and crawl; must avoid concentrated exposure to extreme cold,

> vibrations and hazards; sit six hours out of an eight hour day; stand and
> walk six hours out of an eight hour day.

(Tr. at 17-21, Finding No. 5). At the fourth step, the ALJ found that Claimant was able to perform her past relevant work as a cashier and clerk at a boutique, a cosmetics specialist in a retail store, and a jewelry sales clerk associate, none of which required the performance of work-related activities precluded by the Claimant's RFC. (Tr. at 21-22, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 22, Finding No. 7).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant states three challenges to the Commissioner's decision. (ECF No. 10 at 1). First, Claimant asserts that the ALJ erred at step two of the sequential process by failing to recognize her anxiety and depression as severe impairments. Claimant contends that the evidence supports her claim that these impairments are severe, indicating that she was diagnosed in 2012 by Dr. Ira Potter and Dr. Jason Hudak with anxiety and depression and has received years of treatment for those conditions. (*Id.*). Claimant bolsters her argument by pointing out that Dr. Leigh Ann Ford, a licensed psychologist who evaluated Claimant in 2013, diagnosed her with pain disorder related to general medical conditions, and with depressive disorder. Dr. Ford gave Claimant a Global Assessment of Functioning score of 55,[1] which indicated the presence of moderate

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

psychological impairments. Moreover, Dr. Ford specifically found that Claimant demonstrated a poor ability to relate to co-workers, to deal with work stress and the public, and to be reliable. Claimant maintains that Dr. Ford's impressions are corroborated by Claimant's past dysfunctional relationships with co-workers, which led to her being reprimanded on more than one occasion.

Second, Claimant alleges that both the ALJ and the vocational expert erred by finding Claimant capable of performing medium work in contravention of Social Security Ruling ("SSR") 83-10. (*Id.*). Claimant points out that the requirements for medium work, as set forth in SSR 83-10, include the ability to frequently lift, bend, and stoop, and to demonstrate knee and torso flexibility. Claimant argues that the ALJ's RFC finding, which limits her to only occasional stooping, bending, kneeling, climbing, crouching, crawling and balancing, is inconsistent with the definition of medium work. Therefore, the case should be remanded for further assessment of the RFC finding. (*Id.*).

Finally, Claimant argues that the ALJ failed to give adequate reasons for discounting the RFC assessment of Dr. Ira Potter, Claimant's treating physician. (*Id.* at 8). Specifically, Claimant challenges the ALJ's conclusion that Dr. Potter's assessment was contrary to the medical evidence. Claimant asserts that the ALJ incorrectly interpreted the medical records as showing no significant evidence of neurological compromise that would affect Claimant's ability to stand, walk, or sit to the degree indicated by Dr. Potter. In Claimant's view, the records substantiate the degree of impairment described by Dr. Potter. Claimant points to a 2012 x-ray of her lumbar spine that showed advanced degenerative changes with exaggeration of the lumbar lordosis and diminishment of the disc between L1 and L2. In addition, Claimant relies on a 2014 MRI result demonstrating that she suffers from disc bulge, mild central canal stenosis,

degenerative changes and foraminal stenosis. According to Claimant, the medical evidence, coupled with her limited activities, provide more than ample support to the RFC opinions provided by Dr. Potter. (*Id.* at 8-9).

In response, the Commissioner argues that the ALJ thoroughly reviewed the evidence of Claimant's depression and anxiety at step two of the sequential process. (ECF No. 11 at 12). The ALJ took into consideration Claimant's testimony of a twenty-year history of depression requiring psychotropic medications to provide symptom relief. The Commissioner claims that despite her longstanding complaints, the medical records confirm that Claimant's symptoms are mild, and have consistently improved with medication. (*Id.*). The Commissioner points out that while Claimant complained of psychological symptoms for many years, during most of those years she was able to work at skilled and semi-skilled occupations. With respect to the consultative examination by Dr. Ford, the Commissioner posits that the findings documented by Dr. Ford were modest at best. Dr. Ford confirmed that Claimant was able to independently perform self-care and light household chores, had an intact memory and good eye contact, and her thoughts were appropriate in content, logic, and direction. Claimant's self-reported activities included attending church regularly, visiting with friends and neighbors, and spending time with family members and others. Claimant had no issues with her attention span and admitted that she could follow written or spoken directions with ease. (*Id.* at 13). Thus, the Commissioner contends that, notwithstanding her complaints and treatment, Claimant failed to show any limitations in function attributable to anxiety and depression.

As to Claimant's second argument, the Commissioner disagrees with Claimant's interpretation of SSR 83-10. (*Id.* at 14). Although the Commissioner acknowledges the statement in SSR 83-10 that the "considerable lifting required for the full range of

medium work usually requires frequent bending-stooping," that statement is not inconsistent with the ALJ's finding because the ALJ did not find Claimant could perform the *full range* of medium work. Instead, the ALJ found that Claimant could perform medium work, with the additional limitations that she could only *occasionally* bend and stoop. The vocational expert confirmed that an individual capable of performing medium exertional work, with restrictions to only *occasional* climbing, balancing, stooping, kneeling, crouching, and crawling could perform Claimant's past relevant work. The Commissioner asserts that Claimant's narrow interpretation of SSR 83-10 is, in fact, refuted by the language of the Ruling, when considered in its entirety. (*Id.* at 15).

Finally, the Commissioner argues that the ALJ properly weighed Dr. Potter's RFC assessment and supplied an adequate explanation for giving the assessment little weight. (*Id.*) The Commissioner emphasizes that while the March 2012 x-ray of Claimant's lumbar spine showed degenerative changes, exaggeration of the lumbar lordosis, and diminishment of the disc between L1 and L2, an MRI performed over two years later revealed multilevel degenerative disc disease and facet osteoarthritis which, contrary to Claimant's contention, are "mild" changes. (*Id.* at 16). The Commissioner also references Dr. Potter's treatment notes, which include only unremarkable findings. Furthermore, although Claimant complained of longstanding back pain, she conceded that the intensity of the pain was a mere "one" on a ten-point pain scale. Lastly, Claimant's other medical provider, Dr. Hudak, also noted modest findings and provided conservative treatment. (*Id.* at 17). The Commissioner argues that the record, therefore, supports the weight given by the ALJ to Dr. Potter's RFC opinions.  (*Id.* at 17-18).

## V.    **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The relevant

medical information is summarized as follows.

### A. Treatment Records

Claimant began treatment with Michael W. Gibbs, M.D., at the Family Medical Center, on January 11, 2005. (Tr. at 272-73). Claimant indicated that she had seen several physicians at the Center in the past, but now wished to establish care with one physician. Dr. Gibbs noted that Claimant was married, with adult children, and worked as a cosmetic salesperson at a local department store. (Tr. at 272). Claimant complained of heartburn; recent weight gain; generalized symptoms of joint pain, swelling, and stiffness in her back and neck and pain; and stiffness and spasms in her knees. Upon examination, Claimant was documented to be five feet, five inches tall, weighing two hundred sixty one pounds. (Tr. at 273). She was alert and oriented and in no acute distress. The only positive findings were in Claimant's knees, which revealed trace edema bilaterally with crepitus. Claimant reported occasional numbness of the fourth toe of her left foot, but had no feet lesions or loss of sensation in her feet. Dr. Gibbs assessed Claimant with Type II diabetes, hypertension, greater than ideal body weight, depression with anxiety features, gastroesophageal reflux disease (GERD), rosacea, and osteoarthritis of bilateral knees. Claimant's medication at that time included Lisinopril, Minocycline, Tagamet, Lexapro, Metaglip, and multi-vitamins. Dr. Gibbs continued Claimant on her medication regimen and advised her to take an aspirin and calcium tablet daily. (Tr. at 272-73). Claimant was instructed to follow up in three months. (Tr. at 273).

Claimant returned to Dr. Gibbs four more times in 2005. (Tr. at 264-71). On April 13, 2005, she complained of considerable dizziness and disassociation, which Dr. Gibbs felt was most likely due to Lexapro. (Tr. at 270). With respect to her diabetes, Claimant had no information about her daily blood sugars. Dr. Gibbs noted that Claimant had been

given a prescription for a glucometer, but she had failed to obtain one. Claimant's physical examination was unremarkable except for bilateral trace edema of her extremities. Dr. Gibbs discontinued Lexapro and replaced it with Cymbalta. On May 25, Dr. Gibbs noted that the change from Lexapro to Cymbalta had worked very well for Claimant. Her hypertension was stable, and her depression was much improved, although she continued to show poorly controlled blood sugars. (Tr. at 268). On August 23, Claimant appeared alert and oriented, in no distress and very pleasant. (Tr. at 266). She indicated that Cymbalta had worked well without any side effects; however, it was too expensive and she could not afford it with all of her other medications. Accordingly, Dr. Gibbs replaced Cymbalta with Effexor. (Tr. at 266). Claimant returned for follow-up on November 29 to discuss her medication regimen. She believed that one of her medications, Metaglip, caused her to feel less alert. (Tr. at 264). Therefore, Dr. Gibbs replaced that medication.

According to the records provided, Claimant saw Dr. Gibbs twice in 2006. (Tr. at 260-62). On July 21, she reported a new onset of nightly leg cramps and worsening left hip sciatica. She also indicated that her depression had increased since the death of her cousin. (Tr. at 261). On examination, Dr. Gibbs noted that Claimant had a seven-pound weight loss, seem fairly upbeat, and was in no apparent distress. She complained of some tenderness in the left paralumbar area at the sacroiliac joint on palpitation. Dr. Gibbs administered a trigger point injection using Depro-Medrol and prescribed quinine sulfate for Claimant's leg cramps. He assessed Claimant with lumbar disc disease with left sciatica and trigger point injection, depression with mild exacerbation, leg cramps, Type II diabetes, and well-controlled hypertension. At her follow-up on October 18, Claimant stated that her back pain was much improved. Dr. Gibbs noted that an MRI of Claimant's lumbar spine showed mild spinal stenosis.

Claimant next returned to Dr. Gibbs on May 18, 2007. (Tr. at 258-59). Since her last visit, Claimant had suffered a right shoulder fracture; however, she had no other changes or complaints. Her leg weakness had improved. (Tr. at 258). Claimant was alert, oriented, and in no distress. Examination revealed trace edema of the lower extremities bilaterally without cyanosis and other abnormalities. Dr. Gibbs appreciated a mild irregularity in Claimant's heartbeat, so he performed an electrocardiogram which revealed sinus rhythm with a leftward axis and occasional PCVs unifocal. (*Id.*). Claimant was assessed with well-controlled hypertension, Type II diabetes, GERD, and gouty arthritis.  Her medication regimen remained the same.

Claimant saw Dr. Gibbs three times in 2008. (Tr. at 254-57). On February 27, Claimant returned for follow-up and to discuss her medications. (Tr. at 256). Claimant appeared alert, oriented, and in no acute distress, although she reported experiencing some significant family stressors. An examination of her lower extremities was normal, as was a neurological examination. Claimant was assessed with severe family stressors, depression, anxiety; Type II diabetes; and GERD. She returned on May 27 and had a normal examination. (Tr. at 255). Claimant reported that she had returned to work and was doing better emotionally. Her diet had improved; however, occasionally, she neglected her medication. Her diabetes and hypertension remained in fair control, and her GERD was stable. On October 21, Claimant complained of leg cramps. (Tr. at 254). Dr. Gibbs noted that Claimant was not compliant with her plan for diabetes control, and her hypertension was slightly elevated.

Claimant returned to Dr. Gibbs three times in 2009 with one cancellation. (Tr. at 249-50, 252-53). At all visits, Claimant was alert, oriented, and in no acute distress. (Tr. at 249, 252-53). On April 21, Claimant reported that she had been taking Avandia for her

diabetes, but stopped the medication due to its cost. Dr. Gibbs provided Claimant with a new prescription for Avandia. On July 22, Claimant had no complaints other than a mole on the left side of her neck. (Tr. at 252). She advised Dr. Gibbs she wanted to stop taking Avandia. Dr. Gibbs replaced Avandia with Glipizide. He also discussed a low carbohydrate diet with Claimant. On October 20, Dr. Gibbs documented that Claimant had started taking Effexor, but was not taking the medication on a regular basis. (Tr. at 249). She was assessed with Type II diabetes, depression, and well-controlled hypertension. Dr. Gibbs wrote Claimant a prescription for Venlafaxine, the generic version of Effexor. (*Id.*).

In 2010, Claimant saw Dr. Gibbs three times. (Tr. at 247-48, 281). On January 19, Claimant told Dr. Gibbs she was doing fine with her medications, but was not controlling her diet well. (Tr. at 248). She had no other complaints. Claimant was assessed with Type II diabetes; stable hyperlipidemia and hypertension; and depression, mood stable. On February 3, Dr. Gibbs sent Claimant results from laboratory tests which showed a mild elevation of her cholesterol (208) and a blood sugar that was above normal. He advised Claimant to consider Byetta injectable two times a day, informing Claimant this was not insulin and was known to aid in weight loss. (Tr. at 281).  On July 20, Claimant appeared alert, oriented, and in no acute distress. (Tr. at 247). Dr. Gibbs assessed Claimant with Type II diabetes, hypertension, and memory loss, although he noted the memory loss was not significant. Claimant's medication regimen included Lisinopril, metformin, Effexor, Mobic, and Glipizide. Her weight at this visit was 248 pounds. Dr. Gibbs concluded that Claimant was not being compliant with her medication regimen, so he reiterated the need to follow her prescription schedule and to watch her diet.

According to the records supplied, Claimant last treated with Dr. Gibbs in 2011. During that year, she saw him five times. (Tr. at 228-232). On January 14, Claimant

reported having multiple stressors that caused her to withdraw from activities, although she stated that her depression was somewhat less at present. (Tr. at 232). Dr. Gibbs recommended that Claimant begin regular counseling. Her physical examination was unremarkable. She was assessed with depression; hypertension; macular degeneration, without retinopathy; and Type II diabetes. Her medication regimen was not changed.

Claimant returned the following month on February 25, with complaints of continued mood disturbances; however, she told Dr. Gibbs she still enjoyed being around people. (Tr. at 231). Claimant stated that she wanted to quit her retail job and wanted to attend cosmetology school to learn how to do nails. Dr. Gibbs encouraged her. He also increased her medication for depression. Claimant returned on April 8 and reported that she had recently started school. She was not taking her medications as prescribed, so Dr. Gibbs made some medication changes and advised Claimant to return in three months. On July 13, Dr. Gibbs again discussed with Claimant the need to follow her diet, lose weight, and take her medications. (Tr. at 229). He recorded that Claimant was "somewhat receptive" to this advice. Her last visit with Dr. Gibbs was on October 13, 2011. Claimant complained of bilateral legs issues described as "pulsating veins." (Tr. at 228). Dr. Gibbs documented that Claimant's depression had decreased, and she exhibited better diet control. He assessed her with Type II diabetes, hypertension, and hyperlipidemia.

On March 26, 2012, Claimant presented to the office of Ira Potter, M.D., with complaints of depression, nervousness, low back pain, varicose veins, leg cramps, bilateral knee pain, diabetes mellitus, and hyperlipidemia. (Tr. at 295-96). At this visit, Claimant weighed 257 pounds and her blood pressure measured 154/98. (Tr. at 295). Dr. Potter ordered x-rays of the lumbar spine and left foot, which revealed advanced degenerative changes of the lumbar spine with exaggeration of the lumbar lordosis, as

14

well as diminishment of the disc between L1 and L2. (Tr. at 297). An x-ray of Claimant's left foot revealed mild osteoarthritic changes without evidence of acute osseous pathology, as well as a small plantar calcaneal spur. (*Id.*). Claimant was diagnosed with hypertension, depression, and bilateral knee pain. (Tr. at 295).

Claimant returned to Dr. Potter on May 8, 2012. (Tr. at 299-316). Dr. Potter found Claimant's blood pressure and diabetes to be fairly well controlled with medications, and her feelings of nervousness and depression had lessened on medication. Claimant was not receiving psychiatric treatment at the time. An examination of Claimant's lumbosacral spine revealed a positive straight leg-raising test at sixty degrees bilaterally, an increase in lordosis, vertebral tenderness and SI joint tenderness bilaterally, and decreased reflexes. (Tr. at 301). The range of motion of Claimant's lumbar spine was generally decreased; however, motor strength and sensory to pin prick were normal. Claimant's right shoulder showed a normal range of motion with no complaints of pain. Claimant's left shoulder demonstrated mild, decreased range of motion, glenohumeral, along with mild pain on motion. (Tr. at 301-02). Claimant's knees showed crepitus, pain with motion, and loss of flexion. (Tr. at 302).  A mental status examination confirmed that Claimant was grossly oriented in all spheres with intact memory, normal attention, and normal concentration. (*Id.*). Her judgment and insight were both found to be intact. Claimant's mood was normal, and her affect was appropriate. Motor function studies of upper and lower extremities confirmed normal movement, and Claimant was able to stand without difficulty. A Snellen vision examination revealed Claimant had 20/15 vision in both eyes. (Tr. at 305). A hearing screening was also essentially normal. (Tr. at 314). X-rays of Claimant's knees showed no evidence of acute fracture or dislocation. (Tr. at 315). A chest x-ray revealed clear lungs with no evidence of atelectasis, pneumothorax,

pneumonia, consolidation, congestion, or pleural effusion. There was elevation of the right hemidiaphragm and mild degenerative changes seen in the thoracic spine. There was no evidence of acute pulmonary disease. (Tr. at 315-16). Claimant was diagnosed with probable allergies, chronic pain, depression, dizziness, controlled Type II diabetes, GERD, probable hearing loss, hip pain, hyperlipidemia, hypertension, right knee pain, low back pain, degenerative joint disease of the lumbar spine, obesity, probable osteoarthritis, left shoulder pain, statin therapy, treatment with non-steroid anti-inflammatories, and varicosities. (Tr. at 302).

Claimant presented to Dr. Potter on June 5, 2012. (Tr. at 344-47). Dr. Potter observed Claimant's blood pressure and blood sugars were controlled with medication. Claimant's mood was improving, and her nervousness had decreased, although she still experienced some depression. (Tr. at 344). Claimant complained of chronic low back pain that had been present for twelve years. She rated her current pain level as five out of ten on a ten-point pain scale. The pain was described as non-radiating, aching, and burning. She also complained of bilateral hip pain. Claimant's medications included Citalopram, Glipizide, ibuprofen, Kombiglyze, ER Multiphase, Lisinopril, Meloxicam, Omeprazole, Pravastatin, and Vitamin D3. Claimant denied fatigue, loss of appetite, lightheadedness, chest pain, and joint pain.

On examination, Claimant's straight leg-raising test was positive at sixty degrees bilaterally. There was an increase in lordosis and vertebral tenderness, with SI joint tenderness bilaterally and decreased reflexes of the lumbosacral spine. (Tr. at 345). Her hip, knee, and ankle stability were normal. (Tr. at 346). Dr. Potter ordered an x-ray of Claimant's hips, which revealed no radiographic evidence of acute osseous pathology. (Tr. at 347). Dr. Potter also completed a carotid duplex examination which revealed mild

16

intimal thickness with a minimal left ICA stenosis. (Tr. at 348).

On September 4, 2012, Claimant presented to Jason Hudak, M.D., to establish care. (Tr. at 385-86). She provided Dr. Hudak with her medical, surgical, family, and social history. A review of systems was negative for current problems. Dr. Hudak performed a physical examination, which was essentially normal. (Tr. at 386). He diagnosed Claimant with hypertension, Type II diabetes without mention of complications, and hyperlipidemia. (Tr. at 386). He decided to obtain Claimant's records from other providers and see her again in a few weeks.

Claimant returned to Dr. Hudak for follow-up on November 20, 2012. (Tr. at 382). In the interim, she had been hospitalized for complaints of abdominal pain and had her gallbladder removed. Claimant reported that she was still experiencing severe pain with associated diarrhea and vomiting, but other than those symptoms, Claimant had no complaints. Her examination was unremarkable. Dr. Hudak discussed various potential causes for the pain and decided to run some laboratory tests. (Tr. at 383). One week later, Claimant returned to Dr. Hudak for a follow-up visit. (Tr. at 379-81). She had no particular complaints, and her physical examination was normal. Dr. Hudak diagnosed Claimant with Type II diabetes without mention of complications, uncontrolled; urinary tract infection; and irregular heartbeat. He performed an electrocardiogram, which revealed premature atrial contractions, but no other acute changes. (Tr. at 380-81).

Claimant returned to Dr. Hudak on January 8, 2013. (Tr. at 376-78). Her review of systems was negative, including negative for back pain, joint stiffness, limb pain, and dizziness. (Tr. at 376). Claimant's primary health problem was listed as Type II diabetes without mention of complication, uncontrolled. She also had generalized abdominal pain, hyperlipidemia, hypertension, irregular heartbeat, and UTI. Claimant's physical

17

examination was unremarkable. Dr. Hudak assessed Claimant with Type II diabetes, without mention of complication, uncontrolled; hematochezia; and candidiasis. He gave Claimant a flu vaccination, planned to schedule her for a colonoscopy, and ordered laboratory work. (Tr. at 377-78).

On February 18, 2013, Claimant returned to Dr. Hudak for complaints of memory loss. (Tr. at 373-75). Claimant estimated that the problems with her memory began one month earlier and had a frequency of several times per month, with no obvious contributing factors. Claimant was concerned she might have had a mini stroke. (Tr. at 373). A review of systems was otherwise negative. Dr. Hudak performed a neurological examination, which revealed that Claimant's cranial nerves, motor and sensory function, reflexes, gait, and coordination were all intact. (Tr. at 374). Claimant was assessed with memory loss and Type II diabetes, uncontrolled. Dr. Hudak ordered laboratory studies to help assess the cause of Claimant's intermittent, short-term memory loss. He noted that Claimant was taking Lantus 46 and her morning blood sugar was around 100. He advised Claimant to stop oral medications and start Novolog at meals. (Tr. at 375).

On her next visit with Dr. Hudak on April 16, 2013, Claimant made no mention of her memory problems. (Tr. at 370-72). Instead, she complained of constant, aching low back pain that radiated to her thighs. Claimant told Dr. Hudak her back pain had started years prior and was likely aggravated by bending over and repetitive lifting while at work. She also complained of stiffness and radicular leg pain. Claimant noted the pain was worse with walking, back flexion, and twisting movements. Nothing relieved her symptoms. Claimant denied any paravertebral muscle spasm, radicular arm pain, or numbness in her arms or legs. (Tr. at 370). On physical examination, Claimant had no positive findings, and she was described as being in no acute distress. (Tr. at 371). She was

assessed with low back pain, Type II diabetes, and fatigue. Dr. Hudak discussed potential etiologies of Claimant's low back pain, which at present was intermittent, as well as treatment possibilities. Claimant elected a conservative approach to treatment, agreeing to limit her activities. (*Id.*).

On August 22, 2013, Claimant sought treatment with Dr. Hudak for a urinary tract infection and complaints of arm and leg pain, as well as numbness and tingling in her legs. (Tr. at 367-69). A review of systems was negative for fatigue, blurred vision, ear pain, diminished hearing, tinnitus, chest pain, or dizziness. (Tr. at 367). Claimant appeared to be in no acute distress. Her physical examination was negative except for the presence of acne rosacea. Claimant was assessed with urinary tract infection, leg pain, uncontrolled Type II diabetes, and acne rosacea. (Tr. at 368).

The last office record reflecting Claimant's treatment with Dr. Hudak is dated September 30, 2013. (Tr. at 365-66). On that visit, Claimant was assessed with epidermal inclusion cyst, acne rosacea, and generalized osteoarthritis, multiple sites. (Tr. at 366). She was prescribed Minocycline for treatment of acne rosacea. Dr. Hudak also changed Claimant's prescription for generalized osteoarthritis to a non-steroidal anti-inflammatory medication. (*Id.*).

On April 23, 2014, Claimant underwent an MRI of the lumbar spine without contrast at St. Mary's Medical Center, as ordered by Dr. Hudak. (Tr. at 413-14). The imaging was interpreted as showing no evidence of acute fracture or subluxation. There was mild scoliosis and evidence of degenerative changes, including a broad-based disc bulge resulting in mild central canal stenosis at T11-T12; a broad-based disc bulge resulting in mild central canal stenosis with facet degenerative changes at T12-L1; disc bulge with asymmetric, broad-based right far lateral disc osteophyte complex, central

canal stenosis, severe foraminal stenosis on the right and mild facet degenerative changes at L1-L2; disc desiccation with broad-based shallow left far lateral protrusion, mild ligamentum flavum hypertrophy, facet degenerative changes, minimal central canal narrowing, and moderate to advanced left foraminal stenosis at L2-L3; a broad-based disc bulge with facet osteoarthritis/ligamentum flavum hypertrophy with findings of a moderate degree of central canal stenosis, moderate foraminal stenosis on the left, and mild on the right at L3-L4; a small broad-based disc bulge and facet osteoarthritis/ligamentum flavum hypertrophy with findings of mild central canal stenosis, foraminal stenosis appearing mild bilaterally at L4-L5; and minimal disc bulge, facet osteoarthritis with no significant central canal stenosis, mild right foraminal stenosis at L5-S1. (*Id.*).

**B. Evaluations and Opinions**

On July 16, 2012, Michelle Butler, Psy.D., prepared a Psychiatric Review Technique. (Tr. at 64-68). Dr. Butler found Claimant to have severe medically determinable impairments of osteroarthrosis and allied disorders, spine disorders, and obesity. (Tr. at 67). She also assessed Claimant with an affective disorder under 12.04, but did not believe the disorder had any impact on Claimant's activities of daily living, or social functioning. Dr. Butler felt Claimant had mild difficulty with maintaining concentration, persistence and pace, but had no episodes of decompensation. There was no evidence of paragraph "C" criteria. (Tr. at 67-68). Dr. Butler pointed out that while Claimant alleged depression and anxiety with onset of medical problems in 2011, she was able to take care of her personal needs; prepare complete meals with assistance; shop; manage her finances; watch television; and attend church, social activities, and doctor appointments. Dr. Butler acknowledged Claimant's reports of memory loss and difficulty

completing tasks. Dr. Butler opined that the overall subjective and objective evidence supported some of Claimant's statements as to her limitations, but some statements were disproportionate to the record. Therefore, Dr. Butler found Claimant to be only partially credible. (Tr. at 68). On October 8, 2012, Jeff Boggess, Ph.D., reviewed Dr. Butler's Psychiatric Review Technique, noting that there was no new psychiatric evidence provided in the interim. (Tr. at 74-78). Dr. Boggess affirmed Dr. Butler's report as written. (Tr. at 78).

Subhash Gajendragadkar, M.D., completed a Physical Residual Functional Capacity Examination ("PRFCE") on July 18, 2012. (Tr. at 69-71). Dr. Gajendragadkar found that Claimant could occasionally lift or carry fifty pounds; frequently lift or carry twenty five pounds; stand, walk, and/or sit about six hours in an eight-hour work day; and had unlimited ability to push or pull. (Tr. at 70). As to postural limitations, Claimant could occasionally climb ramps, stair, ladders, ropes or scaffolds; balance; stoop; kneel; crouch; and crawl. She had no manipulative, visual, or communicative limitations. (*Id.*). Dr. Gajendragadkar opined that Claimant should avoid concentrated exposure to extreme cold, vibration and hazards such as machinery and heights; however, she could tolerate unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases or poor ventilation. (Tr. at 70-71). On October 15, 2012, A. Rafael Gomez, M.D., reviewed the evidence in the file and affirmed the PRFCE of Dr. Gajendragadkar, as written. (Tr. at 79-83).

Ira Potter, M.D., completed a Medical Report form on September 14, 2012. (Tr. at 349-50). Dr. Potter found no issues with Claimants eyes, ears, circulatory system, varicosities, or her respiratory system. He did note that Claimant's had diabetes mellitus and morbid obesity, but she had no neurological problems. (Tr. at 349). With respect to

21

Claimant's musculoskeletal system, Dr. Potter related Claimant's complaints of back, shoulder, and knee pain. She did have evidence of tenderness over her lumbar spine, a positive straight leg-raising test, decreased lordosis, and decreased range of motion. Medical imaging reflected degenerative changes at various points in her spine. In addition, her left foot showed osteoarthritic changes and a calcaneal spur. (*Id.*). Claimant's knees were tender to palpation with bilateral crepitus and some loss of flexion. (Tr. at 350). X-rays of the right shoulder revealed an old injury and degenerative changes. Dr. Potter marked no abnormalities as to Claimant's cardiac system, and did not complete the section on psychiatric disorders. (*Id.*) He diagnosed Claimant with severe low back pain with degenerative disc disease and degenerative joint disease. He also found Claimant to have severe morbid obesity, mild diabetes mellitus, moderate shoulder osteoarthritis, and hip pain. (Tr. at 350). Dr. Potter felt that Claimant's conditions would last twelve or more continuous months. (*Id.*).

On the same day, Dr. Potter completed a Medical Assessment Form of Ability to do Work-related Activities (Physical) and a functional evaluation. (Tr. at 351-53). He opined that Claimant could carry five pounds frequently, and less than ten pounds occasionally. She could stand or walk two hours in an eight-hour work day and only 45 minutes without interruption. He felt Claimant could sit three hours in an eight-hour work day, but only one hour without interruption. (Tr. at 351). Dr. Potter determined that Claimant could occasionally balance, stoop, crouch, and kneel, but could never climb or crawl. (Tr. at 352). He also opined that Claimant's ability to push and pull was limited by her shoulder, back, and knee pain. However, Dr. Potter did not believe Claimant had any environmental restrictions. Dr. Potter based all of his opinions on Claimant's "chronic low back pain with degenerative joint/disc disease as well as osteoarthritis of the shoulders,

bilateral knee degenerative joint disease and hip pain." (Tr. at 351). In regard to his functional evaluation, Dr. Potter found Claimant incapable of: performing her past work; doing sustained handiwork while sitting for 6-8 hours; doing clerical or sales work while standing 6-8 hours; sustained lifting and carrying for 6-8 hours; frequently lifting and carrying ten pounds or more; driving a motor vehicle for 6-8 hours; operating hand controls for 6-8 hours; relating with co-workers; maintaining regular attendance; and withstanding the stress of productive work activity. (Tr. at 353). However, he did not feel that Claimant was limited in her ability to follow instructions, maintain concentration and attention, remember locations and procedures, and maintain socially appropriate behavior. (*Id.*).

On November 22, 2013, Leigh Ann Ford, Ph.D., completed a Psychological Evaluation at the request of Claimant's counsel. (Tr. at 396-400). Claimant reported that she was born in West Virginia, was raised by her parents, and completed high school and two years of business school, receiving average grades throughout. (Tr. at 396). Claimant was married, had two adult children, and lived with her husband. She was last employed three years earlier, but left the job due to "stress." (Tr. at 397). Claimant indicated that she had taken antidepressants for twenty years, but her only counseling was received six years prior and was short-lived. As far as daily activities, Claimant stated that she had sleep problems due to pain, but was able to care for her daily personal needs, could do light housekeeping, and assisted her husband with managing household bills and doing the shopping. (*Id.*).

Dr. Ford conducted a mental status examination. She described Claimant as having a normal posture and gait, although her motor activity was slightly restless. Claimant maintained eye contact, but her affect was flat and she demonstrated a

pessimistic, depressed mood. Claimant was oriented in all spheres with normal memory capacities. Claimant told Dr. Ford that when she was in great pain, she became irritable. Claimant described frequent depression because "she can no longer do the things that she used to do." Claimant exhibited normal speech and thought content. Her intellectual abilities were intact. Even though reality testing was good, Claimant appeared to have gaps in insight. (Tr. at 397-98). Claimant reported she had trouble making decisions, relating instances when she had lacked focus or had become confused about how to do things. Dr. Ford found Claimant's coping skills to be somewhat deficient. (Tr. at 398).

Dr. Ford administered several tests, including the Rey 15 item test, symptom checklist 90-revised, Kaufmann Test of education achievement, KTEA II, BDI-II, and BAI. The Rey 15 item test, used to test for malingering, revealed a score of ten which was interpreted by Dr. Ford as no indication of either malingering or faking. (*Id.*). The KTEA-II scored Claimant's word reading ability at the 11.2 grade level. The BDI-II scores indicated that Claimant experienced moderate levels of depression, and the BAI scores were consistent with moderate levels of anxiety. (*Id.*). Claimant's results on the SCL-90-R, a personality assessment for a broad number of psychological and psychopathology symptoms, reflected intense distress. (Tr. at 399). Based upon her evaluation, Dr. Ford diagnosed Claimant with pain disorder, related to general medical condition; depressive disorder, not otherwise specified; and gave Claimant a GAF score of 55. (Tr. at 399-400). Dr. Ford opined that Claimant's depression and pain had a significant impact on her life. Dr. Ford concluded that Claimant's prognosis depended largely on her willingness to seek and maintain psychiatric services, including medication and counseling. Dr. Ford believed that Claimant would have difficulty maintaining full time employment. (Tr. at 400).

On November 25, 2013, Dr. Ford completed a Medical Assessment of Ability to do Work-Related Activities (Mental). (Tr. at 401-03). In making occupational adjustments, Dr. Ford found Claimant to have a fair ability to follow work rules, interact with supervisors, use judgment, function independently, and maintain attention and concentration. Claimant had a poor ability to relate to co-workers, deal with the public, and deal with work stress. (Tr. at 401). To support this finding, Dr. Ford referred to Claimant's depression and pain. Dr. Ford next found in the category of making performance adjustments that Claimant had a fair ability to understand, remember and carry out complex job instructions. She had good ability to understand, remember and carry out detailed, but not complex job instructions; and a good ability to understand, remember and carry out simple job instructions. (Tr. at 402). As to personal-social adjustments, Claimant had a fair ability to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations. However, Claimant had a poor ability to demonstrate reliability. (Tr. at 402). Dr. Ford supported these conclusions by stating Claimant's depression and pain would significantly impact her ability to be reliable, noting of particular concern that Claimant's problems with concentration led to indecisiveness. Dr. Ford also found that Claimant's psychologically based symptoms were likely to cause her to be absent from work about three days per month. (*Id.*).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

### A.   **Alleged Error at Step Two**

Claimant contends that the ALJ erred by failing to recognize that Claimant's depression and anxiety were severe impairments. At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1521(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003).

Nevertheless, the mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as severe, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one severe impairment, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). *See also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ explained at step two of the process that Claimant's depression and anxiety were not severe impairments because: (1) despite having symptoms of depression for approximately twenty years, Claimant had received only conservative treatment with medication management; (2) the medication controlled her symptoms well; (3) Claimant

did not treat with a psychiatrist and had never required acute care for psychiatric symptoms; and (4) Claimant's daily activities were not significantly affected by her psychological symptoms. (Tr. at 15-16). The ALJ noted that Claimant's grooming and clothing were neat and normal; she could take care of her own personal needs; she performed household chores, attended church once or twice per week, and participated in a monthly social group. Claimant admitted that she got along well with people that she liked, had hobbies, and had no trouble concentrating on tasks such as paying the bills. (Tr. at 16). Claimant also conceded that medication controlled her mood variances. The ALJ weighed the evidence, examining the medical records, Dr. Ford's evaluation, Claimant's self-reported activities, and her testimony at the hearing, and he concluded that, as long as Claimant took her medication properly, her psychological symptoms did not significantly affect her ability to perform work-related tasks. Substantial evidence supports that conclusion. Claimant had worked steadily during many of the years that she experienced depression and anxiety, and she was able to perform her job duties adequately. All of Claimant's past jobs required considerable interaction with the public, and Claimant identified no real difficulties in dealing with her customers. (Tr. at 197). Claimant did express some problems with co-workers and "young" supervisors, but also indicated that at the same time she had these problems, she was experiencing major family stressors, including the deaths of her father and mother-in-law and her grandson's serious illness. (Tr. at 207).

    In any event, the sequential process proceeded to the third step. Consequently, even if the ALJ erred by not considering Claimant's mental impairments to be severe, the error was harmless as Claimant suffered no prejudice. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not

28

reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012 WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). A number of federal courts of appeals have agreed with this approach. *See Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v.*

*Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *and Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In the present case, the process continued, and the ALJ clearly considered the effect of Claimant's psychological symptoms on her RFC, explaining his rationale for not including restrictions related to psychological impairments. The ALJ explicitly rejected Dr. Ford's one-time examination findings and gave great weight to the opinion of the agency consultant, who found Claimant's psychological impairments to be "not severe;" thereby, indicating that Claimant had no significant work-related restrictions associated with her mental health. (Tr. at 78). The ALJ reiterated that the evidence did not support the existence of functional limitations related to Claimant's depression and anxiety. Accordingly, the undersigned **FINDS** that the ALJ complied with Social Security regulations and rulings in his treatment of Claimant's psychological impairments.

### B.    RFC Finding of Medium Exertional Work

Claimant next argues that the ALJ erred by finding her capable of performing medium level exertional work. Claimant asserts that medium work, as defined in SSR 83-10, requires the ability to frequently bend and stoop, and to demonstrate knee and torso flexibility. As such, the ALJ's RFC finding, which limited Claimant to only *occasional* stooping, bending, kneeling, climbing, crouching, crawling and balancing, was intrinsically inconsistent with the definition of medium work. The undersigned finds Claimant's argument to be without merit for the simple reason that medium level work does not always require frequent bending and stooping. Therefore, the ALJ's determination that Claimant could manage the lifting, standing, walking, sitting, pushing and pulling requirements of medium work, but could only occasionally bend and stoop was a valid RFC finding. *See Harrington v. Astrue,* Case No. 1:06–CV–936, 2008 WL

30

819035, at *5 (Mar. 21, 2008 M.D.N.C.) (noting that "medium work does not always require frequent bending and stooping").

The United States Department of Labor, in the publication *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (SCO)*, classified occupations as sedentary, light, medium, heavy, or very heavy based upon the degree of primary strength required to perform the occupations. Primary strength is judged by looking at three work positions (standing, walking, and sitting) and four worker movements of objects (lifting, carrying, pushing, and pulling). SSR 83-14, 1983 WL 31254, at *1 (S.S.A. 1983). The SSA adopted these exertional classifications for use by the ALJ at the fourth and five steps of the sequential evaluation process. SSR 96-8P, 1996 WL 374184, at *3 (S.S.A. 1996). At the third step of the process, the ALJ determines whether the claimant's impairments meet or medically equal a listed impairment. If the impairments do not, the ALJ outlines the claimant's RFC by analyzing the claimant's limitations, restrictions, and work-related abilities on a function-by-function basis. *Id.* Once this analysis is completed, the ALJ moves to the fourth step of the evaluation and considers whether the claimant can perform his past relevant work as it was actually performed by him. If not, it becomes necessary for the ALJ to assess claimant's ability to perform his past relevant work as it is generally performed in the national economy. At this point, the ALJ may express the claimant's RFC in terms of a corresponding exertional level of work. *Id.* Because the analysis subtly shifts at step four from an assessment of the claimant's limitations and capabilities to the identification of the claimant's occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the *most* the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant

is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2 (S.S.A. 1983). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. "[I]n order for an individual to do a full range of work at a given exertional level … the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional limitations, along with his other vocational factors, allow him to perform many of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's limitations prevent him from doing the full range of work contemplated by the exertional level.

In this case, the ALJ found that medium was the highest exertional level of work that Claimant was generally capable of performing on a sustained basis. The Social Security regulations define medium work as:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. §§ 404.1567(c). SSR 83-10 provides further clarification of medium work, stating:

> The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work,

which require precision use of the fingers as well as use of the hands and arms.

The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

1983 WL 31251, at *6. "Consequently, to perform the **full range** of medium work as defined, a person must be able to do both frequent stooping and frequent crouching-- bending both the back and the legs--in order to move objects from one level to another or to move the objects near foot level." SSR 83-14 (emphasis added). However, as the Commissioner emphasizes, a claimant need not be able to perform every occupation classified as medium in order for the ALJ to find the claimant capable of substantial gainful activity within the medium exertional classification. Thus, contrary to Claimant's position, it does not necessarily follow that Claimant must be able to frequently bend and stoop in order to be capable of medium exertional work. *See Avery v. Astrue*, No. 1:11-CV-848, 2012 WL 6861207, at *4 (S.D. Ohio Dec. 12, 2012) *report and recommendation adopted sub nom. Avery v. Comm'r of Soc. Sec.*, No. 1:11CV848, 2013 WL 154083 (S.D. Ohio Jan. 15, 2013) ("Contrary to Plaintiff's argument, the complete text of SSR 83–10 does not indicate that a claimant must be able to do 'frequent' bending, stooping, and crouching even for a *restricted* range of medium work."). When an individual is capable of performing the exertional tasks within a classification (lifting, carrying, standing,

33

sitting, walking, pushing, and pulling), but has additional nonexertional limitations, the ALJ must rely upon the testimony of a vocational expert to identify what jobs within the exertional classification are appropriate for the individual claimant. SSR 83-14, 1983 WL 31254, at *4; *see, also, Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989).

In the present case, the ALJ fulfilled his obligations in crafting Claimant's RFC finding. He did not find Claimant capable of performing a full range of medium work. Instead, the ALJ determined that Claimant had the physical strength to lift and carry 50 pounds occasionally and 25 pounds frequently, could stand or walk for six hours out of an eight-hour work day, could sit for six hours out of an eight-hour work day, and had no limitations on pushing and pulling, all of which met the purely exertional requirements of medium work. *See* SSR 96-8P ("Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling."). However, the ALJ also found that Claimant's nonexertional limitations reduced the range of medium work that she could perform; therefore, the ALJ correctly inquired of a vocational expert whether any jobs were available at the medium exertional level, which could be performed by a hypothetical individual with Claimant's age, education, work history, and RFC. (Tr. at 47). With full attention given to Claimant's individualized RFC, the vocational expert concluded that Claimant could still perform her past relevant work, with the exception of her job at Lowe's. Accordingly, the undersigned **FINDS** that the ALJ did not err in finding that Claimant could perform medium level work, despite additional restrictions on her ability to stoop, bend, and crouch.

34

### C.     Weight Given to Treating Physician's Opinion

Lastly, Claimant contends that the ALJ erred by not providing good reasons for discounting the RFC opinions provided by Claimant's treating physician, Dr. Ira Potter. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in the disability process. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). However, a treating physician's opinion on the nature and severity of an impairment is afforded controlling weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record,

taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight the ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In the instant action, the ALJ indeed gave "little" weight to the opinions of Dr. Potter, Claimant's treating physician from March 26, 2012 to June 5, 2012. During this time period, Dr. Potter had three office visits with Claimant and ordered multiple tests and medical imaging. (Tr. at 290-348). In September 2012, Dr. Potter completed a medical report, physical RFC assessment, and functional evaluation at Claimant's request. (Tr. at 349-53). The assessment included Dr. Potter's opinions that Claimant

36

suffered severe limitations in her ability to lift, carry, stand, walk, and sit, as well as an unspecified limitation on her ability to push and pull. He also opined that Claimant was incapable of doing her past relevant work and other work that would fall within the medium exertional classification.

In the written decision, the ALJ reviewed Dr. Potter's opinions. The ALJ found the opinions to be inconsistent with the objective medical evidence, the clinical records, and Claimant's self-described daily activities. (Tr. at 20). The ALJ pointed to the absence of objective neurological findings to substantiate the severe limitations placed by Dr. Potter on Claimant's ability to stand, walk, and sit. (*Id.*). Moreover, the ALJ noted that Dr. Potter failed to provide any specific findings upon which he based his opinions. The ALJ added that the records in evidence did not corroborate Dr. Potter's opinions given that they showed only conservative treatment, which "consisted of routine outpatient care, with little or no continuing treatment or use of prescribed medications." (Tr. at 20). Having thoroughly reviewed the decision, the undersigned **FINDS** that the ALJ supplied a clear explanation for the negligible weight he gave to Dr. Potter's opinions.

Notwithstanding that finding, the undersigned recognizes that Claimant's actual criticism is not that the ALJ failed to explain his decision, but that the ALJ's explanation is wrong. Claimant contends that the medical evidence corroborates the severe limitations found by Dr. Potter; therefore, the ALJ's decision is not supported by substantial evidence. The undersigned disagrees.

During the seven years that Claimant treated with Dr. Gibbs (between 2005 and 2011), her musculoskeletal symptoms waxed and waned, and her treatment was benign. On multiple occasions, Dr. Gibbs documented that Claimant was noncompliant with her medication regimen, and seemed unable or unwilling to follow a prescribed diet. (Tr. at

229, 247-249, 254, 270). Obviously, her failure to adhere to the recommended treatment protocol prevented her from obtaining the best outcome possible. Even still, Dr. Gibbs noted only mild musculoskeletal symptoms and mood variances that stabilized with medication.

Claimant's three visits with Dr. Potter were equally as unremarkable. On the first visit, he recorded no positive musculoskeletal findings on examination. (Tr. at 295). X-rays of Claimant's lumbar spine showed degenerative changes and some disc diminishment, but no evidence of malalignment or compression fractures. (Tr. at 297). At the second visit, Claimant described her back pain as chronic, aching, and burning, but rated its intensity as only one on a ten-point scale. (Tr. at 299). She indicated that the pain had been present for twelve years, did not radiate, and waxed and waned. On examination, Dr. Potter found some reduced range of motion and a positive straight leg-raising test at sixty degrees, but noted Claimant's motor function in all limbs was normal and her gait was unimpaired. (Tr. at 301-302). He did not prescribe any new treatment for Claimant, did not refer her to a specialist, and did not restrict her activities. (Tr. at 303). At the last visit, Claimant reported her back pain as five on a ten-point scale, but her examination findings were stable. (Tr. at 344-346). An x-ray of her hips was also unremarkable. (Tr. at 347).

The findings documented in Dr. Hudak's records, prepared between September 2012 and September 2013, were also unimpressive. Claimant continued to have waxing and waning musculoskeletal symptoms. (Tr. at 365-86). On some visits, she either made no specific mention of having back, hip, or knee pain, or she outright denied that she had any such symptoms. (Tr. at 365, 373, 376, 379, 382). On April 16, 2013, when Claimant complained most vociferously about back and leg pain, Dr. Hudak discussed treatment

options. However, Claimant chose a conservative approach; essentially, she self-selected activities to limit. (Tr. at 370-71). Certainly, that approach is inconsistent with musculoskeletal impairments severe enough to preclude gainful employment. At her last documented visit with Dr. Hudak, he recommended that Claimant treat her "generalized osteoarthritis" with a non-steroidal anti-inflammatory medication. (Tr. at 366). Dr. Hudak did not refer Claimant to a specialist, recommend physical therapy, administer trigger point injections, or provide any other treatment suggesting that Claimant had severe musculoskeletal complaints.

Claimant argues that medical imaging confirms the severity of her condition; specifically, a 2012 x-ray and a 2014 MRI, which detailed a variety of degenerative changes in Claimant's spine. However, findings on an MRI or x-ray do not, by themselves, establish the nature or extent of Claimant's functional limitations. Moreover, the 2014 MRI, which includes the most thorough delineation of the changes in Claimant's spine, was neither available nor relied upon by Dr. Potter when he prepared his September 2012 opinions. Therefore, the undersigned **FINDS** that the ALJ treatment of Dr. Potter's opinions complied with the relevant Social Security rules and regulations and is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 10), **AFFIRM** the decision of the Commissioner (ECF No. 11), **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: November 5, 2015

Cheryl A. Eifert
United States Magistrate Judge